## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ABARTA OIL & GAS CO., LLC, | ) | Case No. 21-22406 |
|  | ) |  |
| _Debtor._ | ) |  |
| _____ | ) |  |

## DECLARATION OF JAMES A. TAYLOR, PRESIDENT AND
## CEO OF THE DEBTOR IN SUPPORT OF FIRST DAY MOTIONS

I, James A. Taylor, hereby declare as follows:

1.      I am the President and Chief Executive Officer of ABARTA Oil & Gas Co, LLC d/b/a ABARTA Energy, debtor and debtor in possession (the "Debtor"), in the above captioned chapter 11 case (the "Chapter 11 Case"). I have held this position since 1995. I am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age and competent to testify.

2.      I submit this declaration (this "Declaration") in support of certain First Day Motions (as defined below) to assist this Court and parties in interest in understanding the Debtor's business and its operations and the circumstances that compelled the commencement of the Chapter 11 Case. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by others at the Debtor, my review of relevant documents or my opinion based on my experience and knowledge of the Debtor's operations, financial condition, and present financial outlook. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized by the Debtor to submit this Declaration.

3.      Any capitalized terms not expressly defined herein shall have the meaning ascribed to that term in the applicable First Day Motion.

## INTRODUCTION

### A.    The Chapter 11 Bankruptcy Case.

4.    On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor intends to continue in the possession of its property and management of its business as a debtor in possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.

5.    Generally speaking, the Debtor commenced the Chapter 11 Case to pursue a sale of substantially all of its remaining assets pursuant to section 363 of the Bankruptcy Code and otherwise orderly wind-down its business and affairs in an effort to preserve and maximize its going concern value for the benefit of its creditors and equity members.

### B.    The Debtor's Business, Assets, and Financial Performance.

I.    Corporate History.

6.    The corporate history of the Debtor is mildly complex spanning over four decades and three states. ABARTA Oil & Gas Co., Inc. was originally incorporated in 1977 under the laws of the Commonwealth of Pennsylvania as a for profit corporation ("PA AOG"). In 1979, ABARTA Oil & Gas Co., Inc. was incorporated under the laws of the State of Ohio as a for profit corporation ("OH AOG") to conduct the Debtor's business operations in Ohio. On December 31, 1981, OH AOG and PA AOG completed a merger with OH AOG being the surviving corporation. On December 31, 2014, OH AOG converted from an Ohio corporation to a Delaware corporation ("DE AOG"). Finally, on January 1, 2018, DE AOG converted from a Delaware corporation to a Delaware limited liability company as part of an overall global corporate restructuring of its secured indebtedness and capital structure. As part of the conversion, DE AOG changed its name to ABARTA Oil & Gas Co., LLC, the Debtor hereunder.

II.     Business Operations.

7.      Headquartered in Pittsburgh, Pennsylvania, the Debtor is an independent oil and gas exploration and production company operating under the name ABARTA Energy.  The Debtor began its operations by making relatively modest investments with different oil and gas developers and remained a passive financial partner through the late 1980s.

8.      In the late 1980s and 1990s, the Debtor became a more active partner with energy companies who shared its vision for growth.  During that time, the Debtor developed in-house expertise in geology, engineering, and operations so it could pursue a balance between continued growth through the drill bit and acquisition.  By the late 1990s, the Debtor was a complete operating company, owning and operating over 700 wells in West Virginia, Kentucky, Pennsylvania, Ohio, and Texas.

9.      During its history, the Debtor has drilled and completed numerous wells utilizing its own drilling rig and is experienced in designing, constructing, and reclaiming drilling locations, associated surface equipment, and pipelines.  The Debtor has participated in the development of over 200 horizontal wells in the Marcellus and Utica shale formations.  The Debtor also previously served as the operator of hundreds of wells, miles of pipeline, and multiple compression and processing facilities in Pennsylvania, West Virginia, and Kentucky. Until recently, the Debtor had active field offices in Pennsylvania, West Virginia, and Kentucky.

10.     As described in more detail below, largely due to the historic and dramatic decline of crude oil and natural gas prices, the Debtor determined in 2019 that it would be in its best interest to liquidate its oil and gas portfolio and otherwise orderly wind-down its business and affairs. Since that time, the Debtor closed on a number of sale transactions realizing approximately $5.5

million in net proceeds and, perhaps more importantly, shedding approximately $7.7 million[1] of contingent asset retirement obligations ("AROs") associated with the future plugging and abandonment of under-producing or non-producing oil and natural gas properties and related facilities (i.e., the removal of equipment, plugging of the well with cement, any environmental clean-up, etc. necessary to shut the well down).

11.     Today, the Debtor: (i) owns an interest in approximately 1,995 net acres of leases principally in Pennsylvania and Ohio (collectively, the "Leases"); and (ii) owns an interest in approximately 362 gross oil and natural gas wells in Pennsylvania, Ohio, and Louisiana. The Debtor also holds an interest in deep rights in approximately 5,500 acres of oil and gas leases for future unconventional development in the Marcellus, Utica, and Burket shales.

III.    Oil & Gas Holdings and Assets.

12.     The Debtor's principal remaining oil and gas asset is a 5.2% non-operating working interest in a natural gas field consisting of approximately 1,722 net acres and the pipeline gathering field related thereto located in and around Chaffee Corners (Bradford County), Pennsylvania (the "Chaffee Corners WI"). The operating partner on this project is Repsol USA and the other non-operating partner on the project is BKV Corp. While most of the gas running through the gathering lines for this project is partner produced, the project also generates revenue by transporting third party produced gas through the project gathering lines to utility transmission lines. As detailed below (and the sale motion filed contemporaneously herewith), the Debtor intends to sell the Chaffee Corners WI through a Court supervised sale process.

---

[1] $7.7 million is the approximate ARO liability shed from the Debtor's books and records from a GAAP accounting perspective. The actual cost if the Debtor was required to perform the ARO work would likely be approximately $20-30 million.

13.    In addition to the Chaffee Corners WI, certain other nominal non-operating oil and gas working interests, and the deep rights referenced above, the Debtor owns the real estate related to its field office located in Kentucky which property is under an Agreement of Sale with an unrelated third party and will be presented to this Court for approval.

IV.    <u>Employees</u>.

14.    As of the Petition Date, the Debtor employed approximately nine (9) full time employees, all of which are on salary.[2]  The Debtor's highly-skilled employees occupy a variety of positions.  These employees' skills, knowledge, and understanding of the Debtor's operations and infrastructure are essential to preserving operational stability and efficiency.  None of the Debtor's workers are subject to a collective bargaining agreement.

V.    <u>Financial Performance</u>.

15.    Leading up to its decision to wind-down and liquidate its holdings, the Debtor generated the majority of its revenue through the sales of natural gas, crude oil, natural gas liquids, and its overriding royalty interests.  Virtually all of the Debtor's natural gas sales was made to midstream and downstream natural gas companies under one year contracts.

16.    As of December 31, 2020, the Debtor's books and records reflected current assets, property and equipment totaling approximately $13.7 million and total liabilities of approximately $25.4 million[3].  For the calendar year ending December 31, 2020, the Debtor generated revenues of approximately $4.2 million, incurred operating expenses of approximately $9 million, for a net operating loss of approximately $4.8 million.  For the year to date ending September 31, 2021, the Debtor generated revenues of approximately $3.3 million, incurred operating expenses of approximately $4.1 million, for a net operating loss of approximately $800,000.

---

[2] While I am an employee of the Debtor, I do not receive a salary from the Debtor.
[3] For clarity, this value does not include contingent ARO liabilities.

C.    **The Debtor's Capital Structure and Indebtedness.**

I.    Capital Structure.

17.    The aggregate membership interest in the Debtor is composed of 2,250 units (the "Units"), divided into 2,000 common units (the "Common Units") and 250 preferred units (the "Preferred Units"). As of the Petition Date, the Debtor has issued and outstanding Units as follows:

| Members | No. of Common Units | No. of Preferred Units | Pro rata Share & Percentage Interest of Class of Units |
|---------|---------------------|------------------------|--------------------------------------------------------|
| Delabarta, Inc. | 1,000 | -- | 80% of Common Units |
| Wells Fargo Central Pacific Holdings, Inc. | 250 | -- | 20% of Common Units |
| Wells Fargo Strategic Capital, Inc. | -- | 57 | 100% of Preferred Units |

II.    Prepetition Secured Indebtedness.

18.    The Debtor, Wells Fargo Strategic Capital, Inc., as lender and administrative agent (the "WFSC"), ABARTA, Inc., as lender, and Wells Fargo Bank, N.A., as issuer of letters of credit ("L/C Issuer" and collectively with WFSC, "Wells Fargo") are parties to an Amended and Restated Credit Agreement dated as of January 5, 2016 (as amended, restated, modified or supplemented from time to time prior to the Petition Date, the "Credit Agreement").

19.    As of the Petition Date, the Debtor owes the lenders approximately $7.2 million in secured financing under the Credit Agreement[4] (the "Wells Fargo Secured Debt"). To the best of my knowledge, the Wells Fargo Secured Debt is secured by a first and senior priority lien on substantially all of the Debtor's personal property, including its oil and gas holdings, equipment, leases and cash collateral.

---

[4] Inclusive of the face amount of issued and outstanding contingent letters of credit.

III.    <u>Prepetition Unsecured Indebtedness</u>.

20.    As of the Petition Date, the Debtor has less than $10,000 in trade accounts payable.

21.    The Debtor also owes Dominion Field Services, Inc. ("<u>Dominion</u>") approximately $2.8 million arising under a Termination and Settlement Agreement dated June 3, 2016 related to termination of a transmission services agreement in Pennsylvania (the "<u>Dominion Settlement</u>") and owes BHE Eastern Gas Transmission approximately $170,000 arising under a transmission services agreement that was not assumed by the buyer of the Debtor's West Virginia oil and gas assets.

22.    The Debtor also owes the State of Kentucky approximately $330,000 for real estate taxes associated with certain oil and gas interests it previously owned in Kentucky.

23.    The Debtor also has certain AROs.  While the Debtor was able to shed a significant portion of its AROs in connection with its prepetition sale efforts, the Debtor remains responsible for a modest amount of AROs.  Revisions to the ARO liability typically occur due to changes in the estimated abandonment costs, well economic lives, and the discount rate.  As of the Petition Date, the Debtor estimates that the ARO liability on its books and records is less than $1 million, which is down from an estimated $8.7 million prior to its recent prepetition sales.

24.    The Debtor also has additional unsecured liabilities for various items, including joint venture partner advances and oil and gas distributions to landowners under the oil and gas leases, in the approximate amount of $16,000.

25.    The Debtor also owes its indirect parent ABARTA, Inc. approximately $10.4 million, which amount has accumulated over the history of the Debtor and is related to rents, pension related payments, insurance, and other cost-sharing expenses.

D.    **Events Leading to the Filing of the Chapter 11 Case.**

26.    As described above, the Debtor's business involved the exploration and production of oil and gas interests, which requires significant capital to maintain.  Beginning in 2015, the Debtor's production and royalty revenue was declining due to the start of what became the historic and dramatic decline of crude oil and natural gas prices, and the Debtor has since been downsizing, cost-cutting, and limiting capital expenditures in response.  These macro-economic factors, coupled with the Debtor's substantial debt obligations and obligation to Dominion under the Dominion Settlement, pushed the limits of the Debtor's ability to sustain the weight of its capital structure.

27.    In 2019, the Debtor took aggressive efforts to right the ship by cutting G&A, asset operation costs and engaged MorrisAnderson & Associates, Ltd. in an effort to combat a new round of unfavorable commodity prices.  Nevertheless, the confluence of adverse factors caused – like many other similarly situated exploration and production companies – the Debtor to make the difficult decision of liquidating its assets and winding-down its affairs in order to maximize value for the benefit of all stakeholders.

28.    To assist the Debtor in this process, the Debtor retained Campbell & Levine, LLC as restructuring counsel in late March, 2020 and in May, 2020, the Debtor engaged Copper Run Capital, LLC ("Copper Run") to act as its investment banker and financial advisor in connection with the Debtor's marketing and sale efforts of the Debtor's oil and gas holdings.

29.    With the desire of avoiding a Chapter 11 filing, the Debtor and its professionals negotiated with Wells Fargo and other stakeholders in an attempt to obtain time to sell all of its assets and orderly wind-down its affairs outside of bankruptcy.  These negotiations proved fruitful and notwithstanding the market headwinds, the Debtor (with the assistance of Copper Run and its other professionals) was largely successful in its prepetition sale efforts and was able to close a number of

sale transactions.  The following chart provides a summary of the material sale transactions that occurred in since 2019 which generated nearly $5.5 million in net sale proceeds and shed approximately $7.7 million in AROs.

| ABARTA OIL & GAS CO., LLC ASSET DISPOSAL BY YEAR FOR THE YEARS ENDED 2021 (Sept. 15), 2020, and 2019 | | | | | |
|---|---|---|---|---|---|
| SALE EXECUTION DATE | STATE | AOG PROJECT NAME | BUYER / GRANTEE | DISPOSAL DESCRIPTION | PURCHASE PRICE |
| **2021 (Sept. 15)** | | | | | |
| 09/2021 | KY | COMPRESSOR | Dan's Auto Sales | Compressor and misc. equipment | $15,000.00 |
| 09/2021 | Various | DIVERSIFIED | Diversified Production, LLC | Assignment of all property and well Interest | ($25,000.00) |
| 08/2021 | Various | SHALE ORRI | Arch Energy Partners, LLC | Leasehold overriding royalty interests | $2,550,000.00 |
| 08/2021 | KY | CARTY | Sniper Energy, LLC | Assignment of all property and well Interest | $5.00 |
| 08/2021 | KY | ASHLAND AND COOKSEYFORK | Natural Gas Ventures, Inc (Slone Energy, LLC) | Assignment of all property and well Interest | ($200,000.00) |
| 08/2021 | KY | DOZER | David Sargrves | D6NXL DOZER | $25,000.00 |
| 08/2021 | KY | MISC EQUIP | Dan's Auto Sales | Completion rig and misc. equipment | $32,200.00 |
| 06/2021 | Various | PALMER | Palmer Petroleum, Inc | Assignment of all property and well Interest | $0.00 |
| 03/2021 | PA | CLARION 33 ACRES | Jason D. Clowser (Abbr.) | Land acquisition | $75,000.00 |
| 03/2021 | KY | DRILLING RIG | Dan's Auto Sales | 2006 drill rig and ancillary equipment | $250,000.00 |
| 01/2021 | PA | GREAT OAK | Great Oak Energy, Inc | Assignment of all property and well Interest | $0.00 |
| 01/2021 | PA | CLARION | Murphy Production, Inc | Assignment of all property and well Interest | $40,000.00 |
| 01/20021 | KY | LCG | Lawrence County Gas, LLC | Lease assignment | $46,753.00 |
| | | | | | |
| **(9/15) 2021 TOTAL PURCHASE PRICE** | | | | | **$2,808,958.00** |

| | | | | | |
|---|---|---|---|---|---|
| **2020** | | | | | |
| 11/2020 | PA | PGE & MROC | Minard Run Oil Company | Assignment of all property and well Interest | $1,500,000.00 |
| 11/2020 | KY | SOUTHFORK | Zenithal LLC | Assignment of all property and well Interest | $90,000.00 |
| 11/2020 | KY | CONTINENTAL AND DEVON | Beta Helix Energy, LLC | Assignment of all property and well Interest | $851,000.00 |
| 11/2020 | OH | MFC | MFC Drilling, Inc | Assignment of all property and well Interest | ($150,000.00) |
| 07/2020 | KY | MAGNUM | Magnum Drilling of Ohio, Inc | Well bore interest and assets | $90,000.00 |
| 03/2020 | PA | MARCO MIDPENN | Snyder Brothers, Inc | Lease Assignments | $10,100.00 |
| 01/2020 | PA | SENECA | Highland Energy Company | Assignment of all property and well Interest | $21,875.00 |
| 01/2020 | ND | PETRO HUNT | Petro-Hunt LLC | Assignment of all property and well Interest | $59,550.00 |
| Various | Var | Various | Various | Various trucks an d ATVS | $4,700.00 |
| | | | | | |
| **2020 TOTAL PURCHASE PRICE** | | | | | **$2,477,225.00** |
| | | | | | |
| **2019** | | | | | |
| 12/2019 | PA | GREATOAK | Great Oak Energy, Inc | Swank Lease Sale | $65,069.64 |
| 07/2019 | WV | BENGAY | Capital Energy, LLC | Assignment of all Property and well Interest | $25,000.00 |
| 05/2019 | OH | QUALITY | Encourage-Alliance, LLC | Real Estate, Property and Well Interest | $102,125.32 |
| Various | KY | ASHLAND | Various | Various trucks and ATVS | $7,800.00 |
| | | | | | |
| **2019 TOTAL PURCHASE PRICE** | | | | | **$199,994.96** |

30.    After consummation of the above transactions, the Debtor's primary remaining asset is the Chaffee Corners WI. In that regard, after significant prepetition marketing by Copper Run, the Debtor has successfully negotiated an Asset Purchase Agreement for the sale of the Chaffee Corners

WI with Arch Energy Partners, LLC and attempted to consummate this transaction outside of the bankruptcy process. However, due to, *inter alia*, complications and uncertainty surrounding the Chaffee Corners WI transaction and the fact that liabilities of the Debtor far exceed the remaining assets, the Debtor determined that the best way to maximize the value of the Chaffee Corners WI was to sell the asset in a court-supervised 363 sale transaction and otherwise wind-down its affairs in this Chapter 11 Case.

E.    **Objectives of the Chapter 11 Filing.**

31.    After considering various alternatives, the Debtor has determined that a sale of the Chaffee Corners WI and sale or wind-down of its other remaining assets pursuant to one or more transactions during this Chapter 11 Case is the best way to maximize the value of its assets and properties for the benefit of all stakeholders. As mentioned above, the Debtor recently entered into an Asset Purchase Agreement for the Chaffee Corners WI and Copper Run is prepared to market the asset in a court-supervised process.

32.    The Debtor has prepared a 13-week forecast that estimates sufficient liquidity to fund its operations and restructuring expenses postpetition, while the Debtor runs the 363 sale of the Chaffee Corners WI and otherwise wind-down its affairs.

33.    Most importantly, the forecast – and the Debtor's postpetition liquidity – relies upon consensual use of Wells Fargo's cash collateral. The Debtor believes that the use of Wells Fargo's cash collateral will provide the Debtor sufficient liquidity to complete a court-supervised sale and restructuring process that will enable the Debtor to maximize the value of its estate.

## FIRST DAY MOTIONS AND ORDERS

34.    In furtherance of these objectives, the Debtor intends to file a number of first day motions (the "First Day Motions") and proposed orders and respectfully requests that the Court enter

the proposed orders granting the relief sought in the First Day Motions.  I have reviewed each of the

First Day Motions and orders (including the exhibits thereto) and the facts set forth therein are true and

correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought

in each of the First Day Motions and orders: (a) is vital to enable the Debtor to make the transition to,

and operate in, chapter 11 with a minimum interruption or disruption to its business or loss of

productivity or value; and (b) constitutes a critical element in achieving the Debtor's successful

reorganization.

**A.**      **Procedural Motions.**

      **I.**      ***Emergency Motion of the Debtor to Extend Time in which to Files Schedules,
Statement of Financial Affairs, and Related Documents***

35.      The Debtor has filed a motion for an order granting additional time to file its schedules

and statement of financial affairs (collectively, the "Schedules").  The Debtor's operations are complex

and, in light of the prepetition sale efforts, there has not been a sufficient opportunity to research and

produce all of the information and documents to counsel necessary to file the Schedules.  The Debtor

submits that a modest extension of time to file the Schedules will not be prejudicial to any of the

Debtor's creditors or the other parties-in-interest.  Given these facts, the Debtor submits that cause

exists to extend the time for the Debtor to file its Schedules to thirty (30) days after the Petition Date.

**B.**      **Operational Motions.**

      **I.**      ***Emergency Motion of the Debtor for an Order Authorizing the Continued Use of
Prepetition Bank Accounts and Existing Cash Management System***

            a.   The Debtor Should Be Granted Authority to Maintain Its Existing Bank
Accounts.

36.      Before the Petition Date, the Debtor, in the ordinary course of business, maintained the

bank accounts detailed in the Debtor's *Motion for an Order Authorizing the Continued Use of*

*Prepetition Bank Accounts and Existing Cash Management System* (the "Cash Management Motion")

(collectively, the "Bank Accounts").

37.     The Debtor seeks a waiver of the United States Trustee's requirement that the Bank

Accounts be closed and that new postpetition bank accounts be opened at depositories authorized by

the United States Trustee.  If enforced in this Chapter 11 Case, this requirement would cause enormous

disruption in the Debtor's business and would impair its efforts to reorganize.

38.     Maintaining the Bank Accounts would greatly facilitate the Debtor's "seamless

transition" to postpetition operations.  To avoid delays in paying debts incurred postpetition and to

ensure as smooth a transition into chapter 11 as possible, the Debtor should be permitted to continue

to maintain the existing Bank Accounts and, if necessary, to open new accounts and close existing

accounts in the normal course of business operations.  Otherwise, transferring the Bank Accounts will

be tremendously disruptive and time consuming.  Indeed, the Debtor's customers and other third

parties routinely remit payments to the Debtor via electronic transfers.  By permitting the Debtor to

maintain the Bank Accounts, the Court will enable the Debtor to avoid confusion associated with

providing its customers and other third parties new electronic transfer information and the possibility

that such party will attempt to electronically transfer funds into a closed bank account.

39.     The Debtor also seeks a waiver of the requirement that it establish specific bank

accounts for tax payments.  I believe that tax obligations can be paid most efficiently out of the existing

Bank Accounts, that the United States Trustee can adequately monitor the flow of funds into, among

and out of the Bank Accounts, and that the creation of new debtor-in-possession accounts designated

solely for tax obligations would be unnecessary and inefficient.

    b.  <u>The Debtor Should Be Granted Authority to Use Existing Business Forms and Checks</u>.

40.    To minimize expense to the Debtor's estate, I believe that the Debtor should be authorized to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.), as well as checks existing immediately before the Petition Date, without reference to its status as debtor-in-possession.  Once the Debtor runs out of preprinted checks that do not bear that designation, the Debtor will add such designation to any new checks it obtains or creates postpetition.

41.    Parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as a debtor-in-possession.  Changing correspondence and business forms is therefore unnecessary, and would burden the estate by the expense involved and also would disrupt the Debtor's business operations.

    c.  <u>Continuing the Debtor's Existing Cash Management System</u>.

42.    The Debtor's cash management system is relatively simple and straight forward. Virtually all of the Debtor's receipts go into its Operating Account, which is then used to fund the Distribution Account (for the payment of royalties and other lease related payments owed to landowners) and the Payroll Account.

43.    With respect to employee payroll, the Operating Account is used to fund the Payroll Account and, in turn, payment of payroll and related taxes.  The employees of the Debtor are generally paid their compensation by the Debtor's third-party payroll service, SyncHR (the "<u>Payroll Processor</u>"). Direct deposits and tax payments are all processed by the Payroll Processor.  The Payroll Processor deducts the direct deposit amount from the Bank Account and transfers the money to each employees' bank account.   These transfers are made by Payroll Processor, at the direction of the Debtor and in accordance with the payroll information transmitted to the Payroll Processor.

    d.  <u>Need to Continue Cash Management System</u>.

44.    The Debtor seeks authority to continue utilizing its current cash management system, as described above.  Substantially disrupting this cash management procedure would severely impair the Debtor's ability to preserve and enhance its respective going concern values and to successfully reorganize during this Chapter 11 Case.   Moreover, opening new accounts and establishing a new cash management system would also inevitably have a deleterious effect on the Debtor's record keeping – which would subvert the goal of the United States Trustee's guidelines.  It is essential, therefore, that the Debtor be permitted to continue to use its current Bank Accounts and current cash management system.

45.    The Debtor has utilized its cash management system as described herein in its current basic structure for many years in its ordinary, usual, and essential business practices.

46.    The widespread use of this type of cash management system, moreover, is attributable to the numerous benefits it provides, including the ability to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information.  In addition, preserving a "business as usual" atmosphere, and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the cash management system, will facilitate and enhance the Debtor's reorganization efforts to maximize its assets for the benefit of its stakeholders.  For similar reasons, the Debtor should be authorized to continue to fund its business and operations by payments made from the Operating Account.

47.    The Debtor incurs periodic service charges and other fees in connection with the maintenance of the Cash Management System totaling approximately $2,100 per month.  As of the Petition Date, the Debtor estimates that it owes no Bank Fees, but seeks permission to pay all

prepetition Bank Fees and to continue paying the Bank Fees postpetition on a monthly basis in accordance with past practices.

**II.**    ***Emergency Motion For an Order (A) Authorizing The Payment of Employee Obligations; (B) Authorizing the Maintenance of Employee Benefits Programs in the Ordinary Course: (C) Authorizing the Interim Payment of Prepetition Severance Obligations; and (D) Directing Banks to Honor Prepetition Checks for Payment of Employee Obligations***

48.    Prior to the Petition Date and in the ordinary course of its business, the Debtor provided its employees (the "Employees") with wages, salaries, vacation time, holiday time, a Roth 401(k) and Fidelity Traditional 401(k) plan and other compensation.  The Debtor seeks authority to pay the accrued but unpaid prepetition compensation owed to its Employees (along with payroll taxes and other related amounts) in accordance with the Debtor's ordinary business practices.  The Employees are essential to the orderly operation and survival of the Debtor's business.  Consequently, it is critical that the Debtor continues to honor its prepetition obligations to the Employees.

49.    If the Employee obligations are not honored and timely paid, the Employees may suffer personal hardship and be unable to pay their daily living expenses, and may be required to personally bear expenses that were incurred on behalf of the Debtor with the expectation that they would be reimbursed.  There would undoubtedly be a marked deterioration in morale among employees at a critical time, and an attendant negative impact on the Debtor and its operations which could only diminish the value of the Debtor's assets and its ability to achieve its objectives in Chapter 11.

a.  Prepetition Wages.

50.     The Debtor employs approximately nine (9) active Employees.  The Employees are paid every other week,[5] on Friday, for the work they performed during the previous Sunday through the fourteenth day (i.e. Saturday of the second week).

51.     Distribution of the payroll is generally handled by the Payroll Processor with the support of the Debtor.  The Payroll Processor has access to the Payroll Account whereby the Payroll Processor transfers from the Payroll Account, an amount sufficient to cover the then current payroll.  The Payroll Processor similarly directly debits the Payroll Account for the employee and employer taxes and other deductions and remits such payments to the appropriate third party on the Debtor's and employees' behalf.

52.     The Debtor paid the Employees in the ordinary course on November 5, 2021, for work that was performed through October 30, 2021.

53.     The Debtor seeks to pay its Employees for seven (7) of prepetition work for which payment has not yet been made and remit the related taxes and payroll deductions to the appropriate third parties ("Withholding Obligations"), not to exceed the Bankruptcy Code maximum amount.

b.  Vacation Obligations.

54.     Under the Debtor's vacation policy, the Employees earn vacation days (accrued on a monthly basis), depending on the Employee's position and number of years of service. Vacation time must be used in the calendar year in which it was accrued and the Debtor does not compensate any Employee for accrued but unused vacation time.

55.     The Debtor does not seek to pay accrued vacation pay in a lump sum, but rather to continue to allow each affected Employee to use or take accrued vacation or pay for unused

---

[5] As mentioned above, while I am an employee of the Debtor, I do not recieve a salary from the Debtor.

vacation time consistent with prepetition practice.

    c.  Reimbursable Business Expenses.

56.    Prior to the Petition Date and in the ordinary course of its business, the Debtor reimbursed Employees for actual, reasonable, and proper business and/or travel expenditures incurred in the normal course of their employment (collectively, the "Reimbursable Expenses"). The Debtor does not at this time know the precise amount of such incurred but unreimbursed Reimbursable Expenses, but the Debtors estimate that the amount is less than $5,000.

    d.  Roth 401(k) and Fidelity Traditional 401(k) Plans.

57.    The Debtor provides an opportunity for eligible employees to participate in either or both a Roth 401(k) and Fidelity Traditional 401(k) plans. Employees may make elective deferrals up to the maximum allowable by law by way of payroll deductions and the Debtor matches the Employees contributions up to three percent (3%). Virtually all of the Employees elect to participate in either or both the Roth 401(k) and Fidelity Traditional 401(k) plans.

    e.  Employee Benefits.

58.    In the ordinary course of its business, the Debtor maintains an employee benefits program that provides the Employees with medical/health insurance benefits, dental, short and long term disability, group life insurance and various other benefits (collectively, the "Employee Benefits"). These benefits are provided pursuant to prepetition contracts between the Debtor and insurance company/benefit providers. The Debtor intends to satisfy its postpetition obligations for benefits received under the prepetition contract in the ordinary course of business.

    f.  Interim Authority to Continue Paying Former Employees Severance

59.    Contemporaneously with the filing of this Chapter 11 Case, the Debtor filed a motion seeking to authorize a key employee incentive program and a severance program (the

"Severance/KEIP Motion"). As set forth in the Severance/KEIP Motion, the Debtor has historically, at its discretion, paid employees a severance package in the amount of two weeks of wages for each year of service by the employee, continued COBRA coverage for the same duration and outplacement counselling (the "Severance Payments"). As of the Petition Date, the Debtor has been making Severance Payments to three (3) former non-insider employees who were not hired by the buyer of certain assets sold prepetition.

60.     The Debtor seeks to continue making Severance Payments to these non-insider employees, on an interim basis, until the Severance/KEIP Motion is heard and determined by this Court. Continuing to provide these former non-insider employees Severance Payments is reasonable in light of, among other things, their efforts to facilitate prepetition sales with the expectation that, consistent with past practice both before and after the Petition Date, the Debtor would offer Severance Payments to employees terminated as a result of the sale transaction.

61.     Moreover, the COVID-19 pandemic together with oil and gas prices has caused oil and gas companies to downsize and cease operations. Therefore, these former non-insider employees are likely struggling to obtain new employment and rely heavily on these Severance Payments. Lastly, continuing to make Severance Payments to these former non-insider employees will help maintain current employee moral knowing that the Debtor is protecting the interests of its employees (albeit on an interim basis). As such, providing these former non-insider employees continued Severance Payments on an interim basis while the Severance/KEIP Motion is considered is in the best interest of the Debtor and its estate.

**III.**    ***Emergency Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Use Cash Collateral; (II) Granting Adequate Protection; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief***

62.    The Debtor has also sought authority to use cash collateral of Wells Fargo.  For the reasons set forth below, the Court's approval of this First Day Motion is absolutely critical.

63.    The Debtor believes that the best means to maximize the value of the Debtor's assets is to sell its assets and holdings during the course of the Chapter 11 Case.  The Debtor, however, requires the use of cash collateral to operate its business and meet its postpetition obligations pending such sales.  Prior to the Petition Date, the Debtor requested that Wells Fargo permit it to use cash collateral to enable the Debtor to continue to operate in the ordinary course through the sales of substantially all of its assets and wind-down of its affairs.  Following arms-length negotiations, Wells Fargo is willing to allow the Debtor to use Wells Fargo's cash collateral to accomplish these goals subject to certain conditions as described in this First Day Motion.

64.    Without the use of Wells Fargo's cash collateral, as proposed in this First Day Motion, the Debtor's operations will almost certainly have to soon cease, the value of its assets will be severely diminished, and jobs will be immediately lost.  In short, without the use of cash collateral, the Debtor's prospects for a successful reorganization will be substantially undermined and the value of the Debtor's assets and operations will be placed in serious jeopardy.  Therefore, it is imperative that the Debtor be authorized to use cash collateral in order to preserve its assets pending the sale of the Chaffee Corners WI before this Court and wind-down of its affairs through a plan confirmation or other appropriate process.

65.    The Debtor believes that use of cash collateral will be sufficient to enable the Debtor to continue to operate on a going concern basis for at least 13 weeks after the Petition Date, an amount

of time sufficient to allow the Debtor to complete the sale of the Chaffee Corners WI and provide for a wind-down of the Debtor's affairs through a plan confirmation or other appropriate process.

66.     Through arms' length and good faith negotiations, the Debtor has obtained Wells Fargo's consent to use cash collateral.  The Debtor requires immediate access to funds in order to pay essential expense items and provide it sufficient time to complete the Chaffee Corners WI sale process. The Debtor also requires certain funds to pay any unforeseen costs and expenses pending a final hearing on this First Day Motion.  Consequently, the Debtor seeks emergency and interim relief as soon as possible.

### IV.     *Emergency Motion of the Debtor for an Order (A) Authorizing, but not Directing, the Debtor to Pay Joint Interest Billings; (B) Authorizing Operators Under the Joint Operating Agreements to Recoup the Debtor's Share of Joint Interest Billings Against the Debtor's Share of Revenue in the Ordinary Course; and (C) Authorizing Prepetition Royalty Payments to be Honored*

67.     The Debtor has filed a motion for authority to pay joint interest billings, authorize operators to recoup the Debtor's share of joint interest billings against the Debtor's share of revenue, and authorizing prepetition royalty payments to landowners related to the Ashland Interest (as defined below) to be honored.

1.     The Debtor owns a right to extract minerals (a "Working Interest") in approximately 1,995 net acres of oil and gas leases in Pennsylvania, Ohio, and Louisiana.  The Debtor is a non-operating party to various Joint Operating Agreements ("JOAs") governing operations of the wells in which it owns a Working Interest.  The JOAs govern the relationship between the joint interest holders in the Leases.  Under the Debtor's remaining JOAs, a third party is the operator of the Working Interest and the Debtor is responsible its pro-rata portion of the capital expenditures and lease operating expenses ("Joint Interest Billings"), which operating expenses are recouped against the production revenues from the oil and gas wells prior to payment

to the Debtor of any interest in revenues on a monthly basis.  The Debtor's operations and production may be adversely impacted if the operator is not permitted to recoup the Joint Interest Billings in the ordinary course of business.  Indeed, failure to permit the recoupment of Joint Interest Billings against production revenues as required by the JOAs could result in litigation, which would burden the Debtor's estate, and diminish the value of the Debtor's assets to potential purchasers. Namely, the Debtor's working interest partners may have claims against the Debtor under the JOAs for the Debtor's *pro rata* share of operating expenses and any damages related to change in production if unable to maintain operations.

68.    The Debtor therefore requests the Court to authorize its operating partners, subject to the terms of the attached proposed order, the applicable contracts, and applicable law, to continue to recoup the Debtor's *pro rata* share of the valid Joint Interest Billings against the Debtor's interest in revenues on an ongoing basis and in the ordinary course of business.  Alternatively, in the event the operator (instead of recouping the Joint Interest Billings) requests payment, the Debtor requests authority to pay its share of the Joint Interest Billings.

69.    Additionally, while the Debtor no longer holds any Working Interests where it serves as the operator, up and until August 29, 2021, the Debtor was the operator of the Working Interest in a sour gas field consisting of approximately 50,000 net acres and the infrastructure related thereto located in and around Elliott, Johnson, Lawrence, Magoffin, and Morgan Counties, Kentucky (the "Ashland Interest").  As the operator of the Ashland Interest, the Debtor was obligated (pursuant to the terms of the respective lease) to pay landowners a royalty based on the amount of oil and gas extracted from such landowner's property.  Approximately three (3) weeks prior to the Petition Date, the Debtor issued and mailed checks (aggregating approximately $32,000) for the last royalty payments due from the Debtor to such landowner.  Many – but not all – of the checks have been negotiated prepetition,

there are approximately $9,000 in uncashed royalty checks as of the Petition Date, many of which are for less than $150. By this First Day Motion, the Debtor seeks to authorize these landowners to deposit the prepetition royalty checks postpetition, authorize Wells Fargo to honor such prepetition checks, and authorize the Debtor to issue new checks (if necessary) to replace the uncashed prepetition royalty payment checks.

70.    The Debtor believes that permitting landowners to deposit these modest royalty checks now is in the best interest of it and its estate as doing so will reduce the administrative costs and burden on the estate by eliminating such approximately 130 creditors/landowners' involvement in the bankruptcy, many of which will have claims of less than $150. Unless the royalties are paid, this Chapter 11 Case will undoubtedly cause such landowners to file claims and create an unnecessary administrative expense associated with addressing each individual *de minimus* claim. As such, the Debtor seeks to authorize these landowners to deposit the prepetition royalty checks postpetition, permit Wells Fargo to honor such checks, and authorize the Debtor to issue new checks (if necessary) to replace the uncashed prepetition royalty payment checks.

*[Conclusion and Signature Page Follows]*

## CONCLUSION

In order to minimize any loss of value to the Debtor's business and consummate the sale of its Chaffee Corners WI, the Debtor's immediate objective is to engage in business as usual following the commencement of this Chapter 11 Case, with as little interruption to its operations as possible.  I believe that if this Court grants the relief requested in each First Day Motion, the prospect for achieving these objectives, to the maximum benefit of creditors of the Debtor's estates, will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Dated:  November 7, 2021

_____*/s/ James A. Taylor*_____
By:      James A. Taylor
Title:   President and CEO of the Debtor